My Bread Baking Co. *vs.* Pasquale Jesi & another.

Bristol.    January 4, 1966. — February 10, 1966.

Present: Wilkins, C.J., Whittemore, Cutter, Kirk, & Reardon, JJ.

*Damages,* Covenant against competition. *Contract,* Covenant against competition. *Unfair Competition. Evidence,* Discretion.

In a suit in equity by a bakery against its former driver-salesman and a competitor, where it appeared from a master's report that a route supervisor of the plaintiff not subject to any post-employment restriction left the plaintiff's employ and became employed by the competitor, that immediately thereafter the route supervisor solicited customers of the plaintiff and at the route supervisor's suggestion the individual defendant left the plaintiff's employ, was hired by the competitor and was assigned to the route of such customers, and that the competitor intentionally caused the individual defendant to terminate his former employment and to break a post-employment restriction against his working a route to which he had been assigned by the plaintiff, findings by the master that "[b]ut for" the actions of the defendants the plaintiff would have retained such customers, that such actions caused permanent

loss of those customers to the plaintiff, and that its lost profits were a certain amount were warranted and were not inconsistent with another finding of the master that the customers were obtained for the competitor "as a result of . . . [the route supervisor's] efforts alone. The individual defendant . . . did not solicit any of . . . [them] himself." [286–287]

It was within the discretion of a master hearing a suit in equity to exclude questions to a witness which he already had answered in substance [287–288], and to refuse to strike out pertinent direct testimony of another witness because of a proper limitation on his cross-examination. [288]

BILL IN EQUITY filed in the Superior Court on April 29, 1964.

The suit was heard by *Gourdin*, J., on a master's report.

*Charles R. Desmarais* for the plaintiff.

*Norman A. Hubley* for General Baking Company (*Jarvis Hunt*, for Pasquale Jesi, with him).

WHITTEMORE, J. The plaintiff by this bill in equity sought injunctive relief to enforce the contract obligation of its former driver-salesman, the defendant Jesi, not to compete for a period of one year after termination of employment, and an award of damages against Jesi and the defendant Jesi's employer, General Baking Company (General). The final decree enjoined Jesi and General until April 25, 1965, in respect of Jesi's working on any route to which he had been assigned during the last three months of his employment with the plaintiff. The plaintiff (My Bread) has appealed from the interlocutory decree which sustained certain exceptions of the defendants to the master's report and confirmed the report, and from the final decree because it omits damages.

The restriction against competition was in these words: "When a salesman's employment is terminated he shall not work for a period of one year on any part of any route to which he had been assigned in the previous three (3) months."

Jesi and his route supervisor for many years, Nicholas Petitti, left My Bread's employ and were employed by General in April, 1964. The circumstances of their prior association and employment and their employment by General

were as follows: Petitti had been in the bakery goods business for about twenty-five years. For eleven years ending April 2, 1962, Petitti's wholesale distributing company acted as independent agent for My Bread. Jesi was employed by Petitti's company as a driver-salesman during this period and delivered My Bread products. On April 2, 1962, Petitti became employed by My Bread as a route supervisor and Jesi upon the request of Petitti to My Bread became employed by it as a driver-salesman. On the route assigned to him were twelve customers previously served by him for Petitti's company. Petitti's employment with My Bread ended on April 2, 1964. On April 21, 1964, Petitti sought employment with General as a route supervisor and "held out the prospect to [a local manager of] General Baking that immediately upon being hired he could deliver customers . . . with gross sales of $2,500 per week. He named the customers . . . [all] then My Bread customers, most of whom had formerly been customers of Petitti's . . . company." General's manager sought approval of the New York office, this approval relating to the contractual obligations, if any, of Petitti to My Bread. Petitti was not subject to any contractual restriction on competitive acts.

At 8 A.M. on April 25, 1964, the manager hired Petitti as a route supervisor. Petitti suggested to the manager, and the manager agreed, that General should hire Jesi as a driver-salesman to serve the route of customers to be obtained by Petitti. As soon as Petitti was hired he began to solicit My Bread customers. He talked to Jesi and advised him to go to work for General and quit My Bread. Jesi agreed and immediately gave notice of termination. This was at My Bread's office at 12:30 P.M. on April 25, 1964. His employment ended at 1:15 P.M.

(Finding No. 17) "Petitti continued his solicitation of My Bread customers on April 25, 1964." He obtained twenty-three My Bread customers for General, the change to become effective on Monday, April 27. Petitti submitted to General a list of these twenty-three customers as the

route to be served by Jesi. These customers were obtained
for General "as a result of Petitti's efforts alone. The in-
dividual defendant Jesi did not solicit any of these cus-
tomers himself."

At 2:30 P.M. on April 25, 1964, Jesi and Petitti met with
the manager of General, and Jesi was hired to begin work
on Monday, April 27. He was assigned to a route of the
twenty-three customers on the list Petitti had submitted.
This was part of Jesi's route with My Bread, and it in-
cluded fourteen former My Bread customers who had
been on the route during the three months period ending
April 25, 1964. These fourteen customers accounted for
the major portion of gross sales of Jesi's My Bread route.
On April 25, 1964, when General hired Jesi "it had reason
to know that the union contract . . . [with] My Bread con-
tained a post-employment restriction." General received
notice of the specific terms of the restriction on April 26
but took the position that the individual Jesi was not bound
by the terms of the union contract and so it disregarded
the notice from the plaintiff. Jesi sold goods on his new
route on six and one-half days from April 27 to May 5, 1964.
A restraining order was issued on May 5, 1964, and on that
date Jesi was assigned to another route. The fourteen
customers formerly served by Jesi for My Bread have been
retained by General which has sold and delivered its bakery
products to them up to the date of the finding. Twelve of
these fourteen customers were the twelve customers who
had been served by Jesi while employed by Petitti's com-
pany prior to April 2, 1962.

(Finding No. 27) "But for the actions reported here of
both the individual defendant Jesi and the corporate de-
fendant General Baking, the plaintiff My Bread would have
retained the fourteen customers served by Jesi. The ac-
tions reported here of both the individual defendant Jesi
and the corporate defendant General Baking have caused
permanent loss to the plaintiff of these fourteen customers.
My Bread would have made gross sales to these fourteen
customers of $900 per week. If My Bread had retained

these customers and made these sales, its expenses would have increased by $700 per week. Lost profits to My Bread represented by these sales is $200 per week or $10,400 for the one year period of the post-employment restriction. On a daily basis, the lost profits are $40 per day of a five day work week."

The general findings included that General intentionally caused Jesi to terminate his employment with My Bread and intentionally caused and assisted Jesi to break the post-employment restriction. The master submitted finding No. 27 as the basis for computing damages.

The judge sustained the defendants' exceptions to finding No. 27 based on alleged insufficiency of the evidence and inconsistency with finding No. 17. The master, as the required summary of evidence, had submitted all the subsidiary findings of the report and the following: The fourteen customers had been regularly purchasing My Bread products for many years. Most of them had purchased regularly and uninterruptedly for fourteen years prior to April 25, 1964, first from Petitti's company and thereafter from My Bread. On April 25, 1964, My Bread was ready, willing and able to continue to serve them. There was a satisfactory relationship between My Bread and their customers. "There was evidence justifying the inference that . . . [this] state of affairs . . . would continue to exist . . . absent the reported actions of both of the defendants. There was evidence that once the fourteen customers made the change . . . they would not return to the plaintiff. There was evidence that the reported actions . . . resulted in the change of these customers from the plaintiff . . . ."

1. We hold that the exceptions to finding No. 27 were improperly sustained. That finding is not inconsistent with finding No. 17. At the conference at which Petitti was hired, he suggested that Jesi be hired for the express purpose of serving the route of the customers whom Petitti had named as the My Bread customers he would bring to General. The inference was reasonable that Petitti's efforts, which "alone" obtained all these My Bread custom-

ers, were successful because he could and did assure them that they would be served by the route salesman who had served them for so many years. Except that General, with at least constructive notice of the restriction on Jesi's conduct, had agreed to employ Jesi immediately to service these customers, Petitti could not have given this assurance. True, there is no finding that Jesi knew he was being employed to service his present customers. The inference is strong, however, that he would have understood this intention of Petitti and General even if it was not expressed, and of course his work assignment on April 27 made it express. Neither finding No. 17 nor the master's statement of the evidence that "once the fourteen customers made the change . . . to the corporate defendant's products, they would not return to the plaintiff," suggests that the efforts of Petitti which "alone" obtained these customers for General did not include, as a necessary part, supplying Jesi as the route man so that there would be initially no change in or interruption of the service to which they were accustomed.

We do not agree with General that the master has lumped into a general finding lawful and unlawful acts to establish a causal link to damages. The actions "[b]ut for" which My Bread would have retained the fourteen customers were General's hiring of Jesi to continue to service his former My Bread customers and Jesi's going to work for General to do so.

2. The exceptions to the exclusion of certain questions to General's manager were improperly sustained. The manager had already testified that he had not discussed the names of customers with Jesi, that he did not hope that Jesi would be able to obtain some of these customers and that his purpose in hiring Jesi was that he "needed a salesman . . . [in] Greater Boston." The subsequently excluded questions were as to why he hired Jesi and whether he hired him to bring customers from My Bread and the offered answer was that the manager felt Jesi was "a good worker, he had experience and he knew the route, but that

he did not hire him because he thought Jesi would bring the route with him inasmuch as he felt he already had the route through the hiring of : . . . Petitti.'' The exclusion of these questions that had already been answered in substance was within the master's discretion. The new matter stated in the offer of proof (the reason why he did not hire Jesi for the purpose of obtaining the customers) was not directly responsive. Further, if it had been included in the evidence it would not have made the case appear more favorable for the defendants since it emphasized General's interest in obtaining the route that Petitti had supervised for My Bread.

3. It was error to sustain the exception to the exclusion of a question on the cross-examination of an accountant and expert witness. On direct examination the accountant had testified that the plaintiff's total prime cost for the materials sold by the plaintiff to customers on Jesi's delivery route was $535.28 or 43.20% of the total sales figure. The product mix and the number of units of each product sold on Jesi's route was in evidence, as, for example, raisin bread 54 units, batter lunch whipped bread (regular) 655 units, (wheat) 79 units. On cross-examination the witness declined upon instruction of the plaintiff and because of competitive conditions to disclose the prime costs for each of the specific products. The master refused to order the direct testimony struck saying that ''the legitimate interest of the plaintiff . . . in retaining these figures . . . outweighs the very limited interest that you have in the individual figures . . ..''

We think this ruling was within the master's discretion. General necessarily would have its own cost figures for such products, and if the plaintiff's overall figure was significantly out of line it could have so shown as a basis for asking the master either to modify his ruling or to reject the cost figure. For purposes of a prima facie showing of a basis for the computation of damages (which seldom can be made with precision in a case of this kind) the master could accept the overall figure.

4. The interlocutory decree is to be modified to over-rule those exceptions of each defendant that were sus-tained. The final decree is to be modified to include an award of damages against each defendant for the one year period ending April 25, 1965, in the amount of $10,400 as computed in finding No. 27.

*So ordered.*